**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

**FILED**

SEP 07 2021

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

H.V & S.V. minors, by and through her
parent, Amalie Flowers,

        Plaintiffs,

    v.

Civ. No **1 : 21  CV  1731**

CLOVERLEAF LOCAL SCHOOL
DISTRICT BOARD OF EDUCATION; DR.
DARYL KUBILUS JR., in his individual
capacity and in his official capacity as
Superintendent of the Cloverleaf Local
School District; and JASON MYERS, JEFF
SCHREIBER, JANE RYCH, JAMES
CURRAN, and RHONDA WURGLER all
in their individual capacities and in their
capacities as members of the Cloverleaf
Local School District Board of Education,

**JUDGE ADAMS**

        Defendants.

## COMPLAINT

    Plaintiffs, H.V. and S.V. both minors, by and through their parent, Amalie Flowers, *pro*

*se*, hereby file this Complaint against Defendants, Cloverleaf Local School District Board of

Education ("School Board"); Dr. Daryl Kubilus Jr., in his individual capacity and in his official

capacity as Superintendent of the Cloverleaf Local School District; and Jason Myers, Jeff

Schreiber, Jane Rych, James Curran, and Rhonda Wurgler, all individual elected officials sued in

their individual capacity and in their capacity as members of the School Board (collectively,

"Defendants"). In support of the claims set forth herein, Plaintiffs allege and aver as follows:

**PARTIES**

1.      Plaintiff H.V. AND S.V. is a minor child who resides in Cloverleaf Local School District ("CLSD"), in Medina County, Ohio. Plaintiff H.V. AND S.V. is and was at all times relevant hereto a student at a Cloverleaf Local School District public school.  Suit is brought herein on H.V. AND S.V.'s behalf by her mother, Plaintiff Amalie Flowers.

2.      Plaintiff Amalie Flowers is an adult individual who is a resident and taxpayer in the Cloverleaf Local School District, in Medina County, Ohio. Plaintiff Amalie Flowers is the parent of Plaintiff H.V. AND S.V.

3.      Defendant Cloverleaf Local School District Board of Education (the "School Board" or the "Board") is a public entity which, acting under color of law, is responsible for the formulation and implementation of all official governmental laws, policies, regulations and procedures in effect for the Cloverleaf Local School District.

4.      Defendant Dr. Daryl Kubilus Jr. was at all relevant times the Superintendent of the Cloverleaf Local School District; in that capacity, acting under color of law, he is responsible for the implementation of all official governmental laws, policies, regulations and procedures governing the Cloverleaf Local School District. He is sued in his official and individual capacities.

5.      Defendant Jason Myers is a Medina County resident and member of the School Board, sued here in his individual and representative capacity. Mr. Myers is currently the President of the School Board.

6.      Defendant Jeff Schreiber is a Medina County resident and Vice President of the School Board, sued here in his individual and representative capacity.

2

7.      Defendant Jane Rych is a Medina County resident and member of the School Board, sued here in her individual and representative capacity.

8.      Defendant James Curran is a Medina County resident and member of the School Board, sued here in his individual and representative capacity.

9.      Defendant Rhonda Wurgler is a Medina County resident and member of the School Board, sued here in his individual and representative capacity.

10.     At all relevant times hereto, the School Board and the individual Defendants were acting under color of state law.

### JURISDICTION AND VENUE

11.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

12.     This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §1331, 28 U.S.C. §§1343(a)(3), (4), 28 U.S.C. §1367, 28 U.S.C. § 2201, and 42 U.S.C. §1983.

13.     There exists an actual and justiciable controversy between Plaintiffs and Defendant requiring resolution by this Court.

14.     Plaintiffs have no adequate remedy at law.

15.     Venue is proper before the United States District Court for the Northern District of Ohio under 28 U.S.C. §1391 because all parties reside or otherwise are found herein, and all acts and omissions giving rise to Plaintiffs' claims occurred in the Northern District of Ohio.

### FACTS

16.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

**A.      Cloverleaf Local School District Board of Education**

17.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

18.     The Cloverleaf Local School District Board of Education is "composed of five citizens who are representatives of the residents of Chatham, Lafayette, Lodi, Seville, and Westfield. Board members are elected 'at large' on a nonpartisan ballot and serve for staggered terms of four years." http://www.cloverleaflocal.org/board.aspx

19.     The five individuals currently serving as School Board Members are Defendants Jason Myers, Jeff Schreiber, Jane Rych, James Curran, and Rhonda Wurgler.

20.     Defendant Dr. Daryl Kubilus Jr., Superintendent of the District, holds a doctorate degree in Education from Walden University.

21.     Defendant Jason Myers, the President of the School Board, was elected in 2013 and re-elected in 2019.

22.     Defendant Jeff Schreiber, the Vice President of the School Board, was elected in 2015 and re-elected in 2019. He is a Finance Committee Member.

23.     Defendant Jane Rych, the Treasurer Pro Tempore, was elected in 2009 and re-elected in 2013 and 2017.

24.     Defendant James Curran, member of the school board, was elected in 2011 and re-elected in 2017. He is and OSBA Legislative Liaison and a Finance Committee Member.

25.     Defendant Rhonda Wurgler, member of the school board, was elected in 2019. She is an OSBA Student Achievement Liaison and Policy Committee Member.

26.     As Superintendent, Dr. Kubilus is charged with the administration of the CLSD.

27.     All members of the Cloverleaf Local School District Board of Education are subject to the School Board's policy manual, Section B, File BBBB-E "BOARD MEMBER OATH OF OFFICE" which states they "swear (or affirm) that you will

4

support the Constitution of the United States and the Constitution of the State of Ohio; and that you will faithfully and impartially discharge your duties as members of the Board of Education of the Cloverleaf Local  School District, Medina County, Ohio, to the best of your ability, and in accordance with the laws now in effect and hereafter to be enacted, during your continuance in said office, and until your successor is elected and qualified."

https://www.cloverleaflocal.org/BoardPolicy.aspx

**B.     Relevant Policies of the Cloverleaf Local School District Board of Education**

28.     Section A, File AD of the School Board's policy manual, titled "POLICY ON DEVELOPMENT OF PHILOSOPHY OF EDUCATION", provides,

> The Board's philosophy of education shall give direction to the educational program and daily operations of the District.  The philosophy will allow for that flexibility necessary in an ever-changing society; furthermore, the philosophy will provide general criteria by which to assess the District's program and operations.

> Annually, the policy committee of the Board and the Superintendent evaluates the District's philosophy of education.  Suggestions from both staff and community will be considered.

> The committee will revise or confirm the existing philosophy or write a new philosophy.  The committee will then present its recommendation regarding a District philosophy of education. Prior to the start of school, the philosophy will be placed on the agenda for review by the Board of Education.

> All building and course of study philosophies will reflect and extend the Board's philosophy. The Superintendent will disseminate the Board's

philosophy of education to all staff members and have it published in all handbooks.

https://www.cloverleaflocal.org/BoardPolicy.aspx

29.     In addition, the Board's Policy Manual at Section A, File ADA titled "EDUCATIONAL PHILOSOPHY", provides:

> The aim of education is to provide the opportunity for each individual to develop his/her innate potential to the maximum, and to acquire the skills he/she needs in daily life so that he/she is an active, contributing member of society to a degree commensurate with his/her abilities.

> The mission of the Cloverleaf Schools, a student focused district, is to provide a learning environment that challenges and engages all students.

> https://www.cloverleaflocal.org/BoardPolicy.aspx

30.     Furthermore, for the "SCHOOL DISTRICT GOALS AND OBJECTIVES", the Policy Manual at Section A, File AE provides;

Goal #1 (Career-related):

All students will acquire knowledge, skills and attitudes that will enable them to make informed career decisions.

Goal #2 (Social/Emotional):

All students will understand and appreciate diversity, ***practice flexibility of thought, respect self and others, and accept the responsibilities and consequences of their decisions.***

Goal #3 (Academic):

All students will develop their academic skills by engaging in learning activities that challenge them individually to prepare them for the next level.

https://www.cloverleaflocal.org/BoardPolicy.aspx

(emphasis added)

31.     The Board Policy also provides in Section B, File BF, in pertinent part,

Proposals regarding Board policies and operations may originate at any of several sources, including students, community residents, employees, Board members, consultants or civic groups. ***A careful and orderly process is used when examining policy proposals prior to Board action.***

The formulation and adoption of written policies constitute the basic method by which the Board exercises its leadership in the operation of the District. The study and evaluation of reports concerning the execution of its written policies constitute the basic method by which the Board exercises its control over District operations.

https://www.cloverleaflocal.org/BoardPolicy.aspx

(Emphasis added).

32.     Moreover, Section E, File EBC titled "EMERGENCY MANAGEMENT AND SAFETY PLANS", provides, in pertinent part,

The Board acknowledges that the ***safety and well-being of students and staff are high priorities.*** Although emergencies cannot be predicted, effective prevention and management strategies are used to minimize the effects of emergency situations arising in the District.

An emergency is defined as a serious, unexpected, and often dangerous situation requiring immediate action that threatens ***the actual safety and security of students, employees or visitors of the District or whose impact threatens the feeling of safety and security, both of which are detrimental to a positive learning environment.*** Emergencies or hazards include, but are not limited to, an active shooter, hostage situations, bomb threats, bullying, fire, natural disasters, medical emergencies, industrial accidents, suicide, death of a student or employee, acts of violence, trauma and terrorism.

7

https://www.cloverleaflocal.org/BoardPolicy.aspx

(emphasis added)

33.     Additionally, Cloverleaf Local Schools "COVID-19 RESTART GUIDE
2020-2021 SCHOOL YEAR" attached hereto as **Exhibit A,** explains
"Cloverleaf Local Schools will coordinate directly with the Medina County
Health Department to determine a course of action for when a confirmed
case has entered our district/school(s). Protocols are being developed by the
Ohio Department of Health regarding specific steps our district will take in
the event of confirmed COVID cases within our school community. We will
teach healthy hygiene, social distancing, intensify cleaning and disinfection,
and require sick staff/students to stay home"

\*\*\*

***Our plan is based on the premise that the best educational environment
for our students is one in which they are here in school, on campus 100%
of the time.***

\*\*\*

Notably, the policy states, "All students and staff are required to wear face
masks in accordance with orders of the Ohio Department of Health
(Director's Order Requiring the Use of Facial Coverings in Child Education
Settings.). According to the Ohio Department of Health, a ***"facial covering
(mask) is any material that covers an individual's nose, mouth, and chin."***

**C. CLSD's COVID-19-Based Measures**

34.     On August 5, 2021, the CLSD, through Defendant Dr. Daryl Kubilus Jr., issued

to parents via email, its "2021-22 Return-to-School Plan".  See **Exhibit B.**

Face Masks

8

Face masks will be ***optional*** for all students and employees in school except while on school buses (see "school buses" below). Per the Ohio Department of Health, we strongly recommend students and staff who have not been vaccinated wear masks.

Social Distance

We will keep as much seated social distance as we can, but there will be no guaranteed minimum.

School Buses

Per a mandate from the Centers for Disease Control, all students and employees will be required to wear face masks while riding school transportation. We will keep as few students in a seat as the route will enable.

Quarantine

We will follow the requirements of the Medina County Health Department. Currently, quarantine is required if someone is less than six feet away from a COVID-positive or COVID-probable person for more than 15 minutes in a 24-hour period. However, if the parties involved wore face coverings and were at least three feet apart, or if someone is fully vaccinated, quarantine is not required. School district communications to families regarding quarantine will continue via the September 3, 2020, state order. We will continue to follow this or any new orders.

35.    On September 2, 2021, Defendant Dr. Daryl Kubilus Jr. sent an e-mail to Cloverleaf Parents (the "mask mandate") stating as follows:

Dear Cloverleaf Parents,

Our collective optimism for the beginning of this school year has been dimmed by the sheer number of student COVID cases and quarantines. As of yesterday, 11 days into the school year, we had 320 student quarantines, which is 93% of our total from all of last year. Our 50 student COVID cases represent 109% of the total cases we had all last year.

I have received many calls and emails from parents expressing concern about the disruption to education, jobs and family this school year has created. On our current trajectory, we are destined for full remote instruction again. Last night, upon my recommendation, the Board of Education took a step to change that trajectory -- mandatory masking for all students and staff beginning tomorrow, Friday, Sept. 3.

***_Masking will enable us to drastically reduce the number of quarantines that are interrupting student learning._*** According to the Medina County Health Department, while wearing masks our students who are "close contacts" to infected individuals will not have to quarantine. This will be a major step toward getting our students back to class and on the road to uninterrupted learning.

Here are a few other facts about our masking protocol going forward:

1. The mask mandate will be only during the hours school is in session and only indoors. Masks will continue to be required on school transportation. Masking won't be required at other times, including athletic events, but masking of unvaccinated individuals in indoor settings is still "strongly recommended" per the Ohio Department of Health.

2. The Board of Education will review COVID data in 2 weeks and every subsequent board meeting (as needed) to make a determination when it would be appropriate to return to optional masking.

3. There will be no visitors or non-instructional volunteers permitted in the buildings. Instructional volunteers will need to mask.

4. Administrators are working on lunch procedure changes to create additional space for students to spread out and/or schedule changes to increase social distance when students are unmasked during lunch.

I understand this is a divisive issue not just in Cloverleaf, but all over our state and country. As I told the board and audience last night, ***masks are a pathway to keep our kids in our in-person learning environment.*** I have heard loud and clear from our parents, our students and our staff that in-person learning in Cloverleaf is where we want our kids. I completely agree with that sentiment. At this point, the Board and I are doing what we can to preserve in-person learning for our students this year. I am looking

forward to a time when we are 100% back to normal and we can focus on our new

building project, student academic achievement, and the significant athletic accolades

we have accumulated in the last year. We will get through these trying times together.

See attached **Exhibit C**
(emphasis added)

## F.  The Masking Requirement Causes Immediate and Irreparable Harm to Students, Staff, and Community.

49.  In his Affidavit, attached hereto as **Exhibit D**,  Stephen E. Petty, an expert in the field of

Industrial Hygiene who has testified as to the futility and danger caused by an individual

wearing a mask in order to avoid transmitting or becoming infected with Covid-19, states

the following:

> \*\*\*
>
> 3.      I hold relevant industry certifications including board certifications as a C.I.H. (Certified Industrial Hygienist), a C.S.P. (Certified Safety Professional), and as a P.E. (Professional Engineer) in six states (Florida, Kentucky, Ohio, Pennsylvania, Texas and West Virginia). My curriculum is attached hereto as **Exhibit i**.
>
> 4.      I have served as an expert in personal protective equipment and related disciplines in approximately 400 legal cases. I have often been certified as, and provided testimony as, an expert in these areas.   My list of representative cases is attached hereto as **Exhibit ii**.
>
> 5.      For example, I am currently serving as an expert in the Monsanto Roundup and 3-M PFAS litigation.   Recently I testified in four trials for the DuPont C-8 litigation.
>
> 6.      I taught Environmental and Earth Sciences as an adjunct professor at Franklin University.
>
> 7.      I hold nine U.S. patents, most related to heating, ventilation and air conditioning (HVAC) systems.

8.     I am a current member in good standing of the following relevant associations: American Industrial Hygiene Association (AIHA), American Board of Industrial Hygiene (ABIH), American Conference of Governmental Ind. Hygienists (ACGIH), American Institute of Chemical Engineers (AIChE), American Society of Refrigeration, Air Conditioning and Refrigeration Engineers (ASHRAE); Member ASHRAE 40 Std. and TC 2.3, and Sigma Xi.

9.     I am an expert in the field of Industrial Hygiene, which is the science and art devoted to the anticipation, recognition, evaluation, and control of those environmental factors or stressors — including viruses — arising in or from the workplace, which may cause sickness, impaired health and well-being, or significant discomfort among workers or among the citizens of the community.

10.     Industrial Hygiene is fundamentally concerned the proper methods of mitigating airborne/dermal hazards and pathogens, as well as with the design and use of engineering controls, administrative controls and personal protective equipment, among other things.

11.     Medical doctors, virologists, immunologists, and many public health professionals are not qualified experts in these areas by virtue of those aforementioned credentials.

12.     On May 7, 2021, the Centers for Disease Control (CDC) updated its guidance, providing that the primary mechanism for transmission of Covid-19 is through airborne aerosols, and not, as previously stated, by touching contaminated surfaces or through large respiratory droplets, as also stated during previous periods of the pandemic.

13.     Airborne viral aerosols can consist of a single viral particle or multiple viral particles clumped together, and usually smaller than 5 $\mu$ (microns) in size. By comparison, droplets are >5 $\mu$ to >10 $\mu$ in size.

14.     A square micron is approximately 1/4000th the area of the cross-section of a human hair and 1/88th the diameter of a human hair. Covid particles are —1/10 of a micron or —1/40,000th the area of a cross section of a human hair or —1/1,000th the diameter of a human hair.

15.     A recent University of Florida study capturing air samples within an enclosed automobile cabin occupied by a Covid-positive individual showed that the only culturable Covid-19 virus samples obtained were between 0.25$\mu$

to 0.5μ in size.  Particles smaller than 5μ are considered very small and/or very fine or aerosols.

16.    Very small particles do not fall by gravity in the same rate that larger particles do and can stay suspended in still air for a long time, even days to weeks.

17.    Because they stay suspended in concentration in indoor air, very small particles can potentially accumulate and become more concentrated over time indoors if the ventilation is poor.

18.    Very small airborne aerosols pose a particularly great risk of exposure and infection because, since they are so small, they easily reach deep into the lung. This explains in part why Covid-19 is so easily spread, and why so little Covid-19 is required for infection.

19.    Exposure to airborne aerosols is a function of two primary parameters: concentration and time.  Less is better regarding both parameters.

20.    For many reasons, personal protective equipment (PPE) is the <u>least</u> desirable way to protect people from very small airborne aerosols.  Moreover, masks are not PPE since they cannot be sealed and do not meet the provisions of the Occupational Safety and Health Administration (OSHA) Respiratory Protection Standard (RPS), namely 29 CFR 1910.134.

21.    Regarding PPE, facial coverings do not effectively protect individuals from exposure to very small airborne aerosols.  A device referred to as a respirator is required to provide such protection.

22.    The AIHA, in their September 9, 2020 Guidance Document for COVID-19 (**Exhibit iii**) noted that the acceptable relative risk reduction methods must be ≥90%; mask were shown to be only 10% and 5% (see Exhibit iii - Figure 2) and far below the required 90% level.

23.    Similarly, Shah, et al, 2021 (**Exhibit iv**), using ideally sealed masks and particles 1 micron in size, reported efficiencies for the more commonly used cloth masks and surgical masks of 10% and 12% respectively. No mask can be perfectly sealed, thus "real world" effectiveness would be even lower.

24.    Industrial hygienists refer to a "Hierarchy of Controls" that are typically implemented to minimize exposures, including exposures to very small airborne aerosols like Covid-19.

25.     Regarding practical or "engineering" controls, industrial hygienists focus on practices that dilute, destroy, or contain airborne hazards (or hazards in general).

26.     PPE — especially facial coverings — do not dilute, destroy, or contain airborne hazards. Therefore, facial coverings do not appear anywhere in the Industrial Hygiene (IH) Hierarchy of Controls for very small airborne aerosols like Covid-19. Even respirators (part of the PPE Category and not masks) are in the last priority on the Hierarchy of Controls.

27.     Facial coverings are not comparable to respirators. Leakage occurs around the edges of ordinary facial coverings. Thus, ordinary facial coverings do not provide a reliable level of protection against inhalation of very small airborne particles and are not considered respiratory protection.

28.     For example, during the seasonal forest fires in the summer of 2020, the CDC issued public guidance warning that facial coverings provide no protection against smoke inhalation. That is because facial coverings do not provide a reliable level of protection against the small particles of ash contained in smoke. Ash particles are substantially larger than Covid-19 aerosolized particles.

29.     I have reviewed the Cloverleaf Local School District (CLSD) "FACE MASKS" policy as set forth in the COVID-19 Restart Guide 2020-2021 school year.

30.     Ordinary facial coverings like the ones required by the CLSD facial covering policy do not meet any of the several key OSHA Respiratory Protection Standards for respirators.

31.     Because of the gaps around the edges of facial coverings required by CLSD's policy, they do not filter out Covid-19 aerosols. The policy stating masks will be worn without gaps defies known science that masks worn today cannot be sealed and always have gaps.

32.     The effectiveness of a cloth facial covering falls to zero when there is a 3% or more open area in the edges around the sides of the facial covering.

33.     Most over-the-counter disposable facial coverings have edge gaps of 10% or more. When adult-sized facial coverings are used by children, edge gaps will usually greatly exceed 10%.

34. Even short breaks (e.g. to eat) expose individuals to Covid-19 aerosols in indoor spaces.

35. Ordinary cloth facial coverings like the ones required by the CLSD mask requirement do not provide any filtering benefit relative to particles smaller than 5μ if not sealed.

36. Substantial mitigation of Covid-19 particles could be immediately achieved by:

    a. opening windows and using fans to draw outdoor air into indoor spaces (diluting the concentration of aerosols),

    b. setting fresh air dampers to maximum opening on HVAC systems,

    c. overriding HVAC energy controls,

    d. increasing the number of times indoor air is recycled,

    e. installing needlepoint ionization technology to HVAC intake fans, and

    f. installing inexpensive ultraviolet germicide devices into HVAC systems.

37. All of the above-referenced techniques are more effective and meet standard industrial hygiene hierarchy of controls (practices) for controlling exposures in place for nearly 100 years. The use of cloth facial coverings do not fit within these basic hierarchy of controls since masks are not PPE and cannot be sealed. There are no OSHA standards for facial coverings (masks) as respiratory protection.

38. Extended use of respiratory PPE is not indicated without medical supervision.

39. As explained in an article titled "Is a Mask That Covers the Mouth and Nose Free from Undesirable Side Effects in Everyday Use and Free of Potential Hazards?" that was published on April 20, 201, in the *International Journal of Environmental Research and Public Health* and that is attached to this Affidavit as **Exhibit iv**, the following negative effects from wearing masks was reported in the literature:

16

| Increased risk of adverse effects when using masks: | | |
|---|---|---|
| **Internal diseases** | **Psychiatric illness** | **Neurological Diseases** |
| COPD | Claustrophobia | Migraines and Headache Sufferers |
| Sleep Apnea Syndrome | Panic Disorder | Patients with intracranial Masses |
| advanced renal Failure | Personality Disorders | Epilepsy |
| Obesity | Dementia | |
| Cardiopulmonary Dysfunction | Schizophrenia | |
| Asthma | helpless Patients | |
| | fixed and sedated Patients | |
| **Pediatric Diseases** | **ENT Diseases** | **Occupational Health Restrictions** |
| Asthma | Vocal Cord Disorders | moderate / heavy physical Work |
| Respiratory diseases | Rhinitis and obstructive Diseases | |
| Cardiopulmonary Diseases | | **Gynecological restrictions** |
| Neuromuscular Diseases | **Dermatological Diseases** | Pregnant Women |
| Epilepsy | Acne | |
| | Atopic | |

**Figure 5.** Diseases/predispositions with significant risks, according to the literature found, when using masks. Indications for weighing up medical mask exemption certificates.

Example statements made in the paper include the following: "The overall possible resulting measurable drop in oxygen saturation (O2) of the blood on the one hand and the increase in carbon dioxide (CO2) on the other contribute to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase, in some cases also to a significant blood pressure increase." Exhibit iv, p. 25.  In fact, "Neither higher level institutions such as the WHO or the European Centre for Disease Prevention and Control (ECDC) nor national ones, such as the Centers for Disease Control and Prevention, GA, USA (CDC) or the German RKI, substantiate with sound scientific data a positive effect of masks in the public (in terms of a reduced rate of spread of COVID-19 in the population)." Exhibit iv, p. 24.  For these reasons, students who are required to wear masks pursuant to a mandate suffer immediate and irreparable injury, loss, or damage.

40.  In summary:

    a.  PPE is the least desirable way to protect people from very small airborne aerosols.

    b.  Facial coverings as required by the CLSD policy are not recognized as PPE since they cannot be sealed and are not covered by the OSHA RPS.

    c.  If PPE were to be used for protection, respirators, not facial coverings as required by the CLSD policy are needed to

provide any effective protection from very small airborne aerosols.

d. Very small aerosol particles are more likely to be a greater cause of disease than respiratory droplets because they can evade PPE and reach deep into the lungs, whereas respiratory droplets have to work against gravity in order to travel up a person's nose into the sinus.

e. Much better alternatives to controlling exposure are available (i.e., engineering controls of dilution – ventilation with increased fresh air and destruction), and should be used to minimize exposures as opposed to masks.

f. Individuals who are required to wear masks pursuant to a mandate suffer immediate and irreparable injury, loss, and damage due to the overall possible resulting measurable drop in oxygen saturation of the blood on one hand and the increase in carbon dioxide on the other, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

50.   Plaintiffs note that the state of Ohio was given $4,475,243.513 pursuant to the American Rescue Plan ("ARP") Act of 2021 by agreeing to implement the federal guidelines set forth by the CDC for COVID-19 mitigation efforts.  See the attached letter from the U.S. Secretary of Education, attached hereto as **Exhibit P**.  See also, https://oese.ed.gov/files/2021/07/Ohio-ARP-ESSER-State-Plan-Highlights-v2-071421.pdf.  The letter links to the CDC guidelines available at https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/operation-strategy.html.  The guidelines suggest that a school board would forfeit ARP allocations by making masks optional, and states that have prohibited mask mandates in schools have received letter notifying them that they will not receive ARP funds.  Accordingly, it seems Defendants have a financial incentive for

implementing the mask mandate, despite that such a requirement serves no scientific purpose and subjects individuals who wear masks to the health risks discussed above.

51.     Plaintiff Amalie Flowers, in her own capacity and on behalf of her minor children, H.V. AND S.V., is aggrieved by the immediate and irreparable injury, loss, and damage suffered by H.V. and S.V. because H.V. and S.V. are required to wear a mask pursuant to the School Board's mask mandate, which is not only unsupported by science, but which also results in the possible resulting measurable drop in oxygen saturation of the blood on one hand and the increase in carbon dioxide on the other, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

### COUNT I - 42 U.S.C. §1983 - Violation of Procedural Due Process
### (5th and 14th Amendments) Against All Defendants

52.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

53.     In order establish a claim under section 1983 of the Civil Rights Act, a plaintiff must prove a Defendant: (a) acted under the color of state law; (b) proximately causing; (c) the Plaintiff to be deprived of a federally protected right. 42 U.S.C. §1983.

54.     In the instant case, Defendants unquestionably acted under the color of state law.

55.     Each Individual Defendant is an elected, voting member of the Cloverleaf Local School District Board of Education with the exception of Defendant Dr. Daryl Kubilus Jr., who is the Superintendent of the Cloverleaf Local School District.

56.     Under the Fifth Amendment to the Constitution, no person may be deprived of life, liberty, or property without due process of law. U.S. Const. Ann., Amendment V.

57.     The Fourteenth applies the protections of the Fifth Amendment to state actors. U.S. Const. Ann., Amendment XIV.

58.    Plaintiffs have constitutionally protected interests in the benefits that come from the not being subject to the Board's mask mandate, including the ability to pursue an education without being subjected to health risks that are not offset by any scientifically provable benefits.

59.    Defendants' implementation of the mask policy unlawfully deprives Plaintiffs of these and other constitutionally-protected interests without due process of law. Such deprivation occurred with no notice or meaningful opportunity to be heard as the Superintendent instated the mask mandate prior to offering an opportunity for public discussion. Such deprivation was arbitrary, capricious, based on ignorance without inquiry into facts, and in violation of the School Board's own policies and other applicable laws. Such deprivation violates the Fifth and Fourteenth Amendments of the Unites States Constitution.

60.    Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

### COUNT II - 42 U.S.C. §1983 - Violation of Substantive Due Process (Fourteenth Amendment) – Against All Defendants

61.    Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

62.    In order establish a claim under section 1983 of the Civil Rights Act, a plaintiff must prove a Defendant: (a) acted under the color of state law; (b) proximately causing; (c) the Plaintiff to be deprived of a federally protected right. 42 U.S.C. §1983.

63.    In the instant case, Defendants unquestionably acted under the color of state law.

20

64.     Each individual Defendant is an elected, voting member of the Cloverleaf Local School District Board of Education with the exception of Defendant Dr. Daryl Kubilus Jr., who is the Superintendent of the Cloverleaf Local School District.

65.     Under the Fourteenth Amendment to the Constitution, and as established by state law including the state created danger doctrine, Plaintiffs have a fundamental right to a public education and to an education in a safe and healthy environment.

66.     Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

## COUNT III - Violation of Procedural Due Process
### (OH Const. Art. I, § 16) Against All Defendants

67.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

68.     Article 1, § 16 of the Ohio Constitution provides, "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. Suits may be brought against the state, in such courts and in such manner, as may be provided by law."

69.     Article 1, § 16 of the Ohio Constitution affords the people of Ohio with right to be free from violations of the procedural due process rights, and no person may be deprived of life, liberty, or property without due process of law.

70.     Plaintiffs have constitutionally protected interests in the benefits that come from the not being subject to the Board's mask mandate, including the ability to pursue an

education without being subjected to health risks that are not offset by any scientifically provable benefits.

71.     Defendants' implementation of the mask policy unlawfully deprives Plaintiffs of these and other constitutionally-protected interests without due process of law. Such deprivation occurred with no notice or meaningful opportunity to be heard as the Superintendent instated the mask mandate prior to offering an opportunity for public discussion. Such deprivation was arbitrary, capricious, based on ignorance without inquiry into facts, and in violation of the School Board's own policies and other applicable laws. Such deprivation violates Article 1, § 16 of the Ohio Constitution.

72.     Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

### COUNT IV - Violation of Substantive Due Process
### (OH Const. Art. I, § 16) Against All Defendants

73.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

74.     Article 1, § 16 of the Ohio Constitution provides, "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. Suits may be brought against the state, in such courts and in such manner, as may be provided by law."

75.     Article 1, § 16 of the Ohio Constitution affords the people of Ohio with right to be free from violations of the procedural due process rights, and no person may be deprived of life, liberty, or property without due process of law.

76.     Under Article 1, § 16 of the Ohio Constitution, and as established by state law including the state created danger doctrine, Plaintiffs have a fundamental right to a public education and to an education in a safe and healthy environment.

77.     Plaintiffs were harmed and continue to be irreparably harmed by these unlawful acts, including by suffering an overall possible simultaneous drop in oxygen saturation of the blood and increase in carbon dioxide, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

## RESERVATION OF RIGHTS

Plaintiffs herein expressly reserve their rights in regards to any additional claims to which they may be entitled under federal law as well as under the laws of the State of Ohio, including claims arising from any violations of Ohio's Open Meetings Laws or other actions of misconduct that may have been committed by Defendants.     Plaintiffs expressly place Defendants on notice of Plaintiffs' intention to initiate removal proceedings at the state court level against Defendants as a result of the infractions Defendants have committed, as described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

a.  Assume jurisdiction of this action;

b.  Vacate and set aside the Defendants' mask mandate as well as any other action taken by Defendants to institute the mask mandate and implement the provisions of the mask policy;

c.  Declare that the Defendants' masking policy is void and without legal force or effect;

c.  Declare that the institution of the mask policy and actions taken by Defendants to implement the mask policy are arbitrary, capricious, based on ignorance due to failure to inquire into facts, otherwise not in accordance with law, and without observance of required procedures;

d.  Declare that the mask policy and the actions taken by Defendants to implement the mask policy are in violation of the Constitution and contrary to the laws of the United States and the State of Ohio;

e.  Temporarily restrain, as well as preliminarily and permanently enjoin Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from implementing or enforcing the mask policy and from taking any other action to implement the masking policy that is not in compliance with applicable law; and

f.  Grant such other and further relief as may be just, equitable, and proper including without limitation, an award of attorneys' fees and costs to Plaintiffs.


Respectfully submitted this 7th day of September, 2021.

/s/ Amalie Flowers
9565 Guilford Rd
Seville, OH 44273
330-842-0014     (Telephone)
amaliemurphree@gmail.com (Email)
Amalie Flowers, Individually and on behalf of
her minor child P.M.